Filed 2/1/22  Chaudhuri v. The Regents of the University of Cal. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| GAUTAM CHAUDHURI, | B307486 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 20STCP00054) |
| v. | |
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mitchell L. Beckloff, Judge.  Affirmed.

Leader Berkon Colao & Silverstein, Arthur I. Willner; Krane & Smith, Marc Smith, and Daniel L. Reback for Plaintiff and Appellant.

Reed Smith, Raymond A. Cardozo, Kathryn M. Bayes; and Katharine Essick for Defendants and Respondents.

_____

**SUMMARY**

In November 2015, the Vice Chancellor for Academic Personnel of the University of California, Los Angeles filed a formal complaint with the university's Committee on Privilege & Tenure (the Committee) against Gautam Chaudhuri based on a 2013 complaint alleging sexual harassment and a subsequent investigation finding the complainant's account credible. The Committee heard the matter in June 2016 and issued findings and disciplinary recommendations to the university's Chancellor at the end of January 2017. The university's Chancellor accepted the Committee's recommendations, imposed discipline, and recommended imposition of discipline by the university's President, as well.

In February 2018, Chaudhuri filed a petition for writ of administrative mandamus under Code of Civil Procedure section 1094.5 alleging, among other arguments, that the evidence in the administrative record was insufficient to support the Committee's findings against him.[1] The trial court agreed with Chaudhuri regarding the sufficiency of the evidence in the administrative record, granted the petition, entered judgment for Chaudhuri on the writ petition, and issued a writ commanding the university to "set aside the [Committee's] findings and recommendations" and its "acceptance and imposition of all sanctions . . . ." The trial court did not state that it was remanding the matter to any university authority or committee other than to order the university to comply with the writ's terms.

---

[1] Further statutory references are to the Code of Civil Procedure unless otherwise specified.

In July 2019, the Vice Chancellor for Academic Personnel notified Chaudhuri that it had received the notice of entry of judgment and explained the steps it was taking to comply with the trial court's writ. In the same letter, the Vice Chancellor advised Chaudhuri that he would "notify the Committee that the Administration seeks to schedule a new hearing date as soon as possible," and that at the "renewed hearing, the Administration will present evidence that meets the concerns expressed by the [trial] court."

The Committee set the matter for a second evidentiary hearing in February 2020. In January 2020, Chaudhuri filed in the trial court a petition for writ of prohibition requesting that the trial court prohibit the Committee from conducting a second evidentiary hearing. The trial court heard the matter in March 2020, and in May issued an order denying the petition and entered judgment for the university.

On this appeal, Chaudhuri argues that the trial court erred when it declined to prohibit the Committee from holding a second evidentiary hearing regarding Chaudhuri's alleged sexual harassment. As we explain, we agree with the trial court's analysis and conclude that nothing in the judgment or writ of mandate setting aside the Committee's findings and recommendations for insufficiency of the evidence bars the Committee from conducting a second hearing on the merits of the allegations against Chaudhuri. We will affirm the trial court's judgment.

## BACKGROUND

### A. Administrative Proceedings

Gautam Chaudhuri is a tenured professor of medicine and chair of the Department of Obstetrics and Gynecology at the

3

UCLA David Geffen School of Medicine. On May 13, 2013, the university's Sexual Harassment and Title IX Officer notified Chaudhuri that it had received a report that he had sexually harassed E.B.,[2] the woman who worked as his executive assistant from 2009 to 2013. The notice stated that the Vice Chancellor for Academic Personnel and the Academic Senate's Charges Committee had asked for a fact-finding investigation regarding the allegations. It also informed Chaudhuri: "Retaliation is forbidden by law and University policy. Retaliation includes any adverse action that would discourage someone from making a good faith report of suspected discrimination. You must refrain from taking any retaliatory action."

The investigation was conducted by a company retained by the university. During the investigation, the investigator learned of an earlier complaint that had been filed against Chaudhuri. In 2008, K.B., who was serving as Chaudhuri's administrative assistant, reported Chaudhuri to the university's human resources department and the Chief Administrative Officer of the Department of Obstetrics and Gynecology complaining of sexual

---

[2] California Rules of Court, rule 8.90(b) instructs us to consider so as "[t]o protect personal privacy interests" referring to certain individuals by either first name and last initial or by initials only. The list of persons to which this applies includes "[p]ersons in other circumstances in which personal privacy interests support not using the person's name." (Cal. Rules of Court, rule 8.90(b)(10).) We have used initials of the complainants in this matter, both of whom cited personal privacy concerns as deterrents to their participation in the administrative proceedings, in order to protect their personal privacy interests.

4

harassment.  The record indicates that K.B. resigned four months after her initial complaint because, she reported, the harassment continued.

On March 9, 2015, a university Title IX Complaint Review Officer notified Chaudhuri by letter that the investigation had been completed.  On behalf of the UCLA Office of Sexual Harassment Prevention, the complaint review officer informed Chaudhuri that the office had found "by a preponderance of the evidence" that Chaudhuri "is **RESPONSIBLE** for violating the 2006 and 2014 UC Policy on Sexual Harassment by sexually harassing his former Executive Assistant . . . by treating her in a sexually inappropriate manner during a four-year period when she worked as his Executive Assistant from May 2009 to May 2013, and by retaliating against [her] by speaking negatively and revealing private information about [her] both immediately following her complaint and during the investigation."  The letter further notified Chaudhuri that "[i]n accordance with [the] UCLA Academic Senate Manual[,] [the Office of Sexual Harassment Prevention] finds **PROBABLE CAUSE** of a violation of the Faculty Code of Conduct."

Based on that letter and the investigation report that accompanied it, the medical school's Vice Dean filed a "formal disciplinary charge" against Chaudhuri in the Academic Senate Charges Committee.  The Academic Senate Charges Committee found "probable cause that Dr. Chaudhuri's longstanding and pervasive conduct in the way he interacted with [E.B.], and more generally with some subordinate female employees, did create an environment that those female employees could reasonably perceive to be hostile in that it tended to sexualize them."  Based on the Charges Committee's probable cause finding, the

5

university's Vice Chancellor for Academic Personnel filed a formal complaint against Chaudhuri with the Academic Senate Committee on Privilege & Tenure charging Chaudhuri with violations of provisions the Faculty Code of Conduct that prohibit sexual harassment and with violations of the "University Policy on Sexual Harassment and Sexual Violence." Specifically, the university charged Chaudhuri with:

"1. Violating the UCLA Faculty Code of Conduct . . . , Academic Personnel Manual . . . , Policy 015, Part II § C.5 and § C.7:

"a. C.5 'Discrimination, including harassment, against University employees . . . for reasons of sex . . .'

"b. C.7 'Serious violation of University policies governing the professional conduct of faculty . . .'

"2. Violating the 'University Policy on Sexual Harassment and Sexual Violence, which prohibits sexual harassment.'"

Between the filing of the Complaint and the Committee's hearing, the record indicates that "Chaudhuri gave one of the potential witnesses $250." He told the Committee that it was a gift for an event that had occurred five months before he gave the gift. The witness, however, indicated that Chaudhuri had not attended the annual event for the last five years. Chaudhuri also offered—also after E.B. filed her complaint—to give the same witness "author credit on a publication, something he declined to do on a past project they had worked on together." Chaudhuri told another witness that Chaudhuri believed the investigation was " 'motivated by a conflict [Chaudhuri] was having with the Dean's office.' "

The record also indicates that Chaudhuri approached members of the Committee after charges had been filed and

6

before the hearing. During the hearing, "Chaudhuri was . . . asked 'Have you discussed this incident with anyone on the . . . Committee?'[ ] 'Not a single one of us on this Committee you have discussed this proceeding with . . . None of the doctors you see at the Medical School?'[ ] Though Dr. Chaudhuri responded negatively ('No.' 'No.' 'No, not that I know. I didn't discuss with anyone.'),[ ] he had in fact raised the matter with two Privilege and Tenure Committee members, indicating to one, after he was told that the individual had just been appointed to the [Hearing] committee that the 'Dean is out to get me.'"

Before the hearing, Chaudhuri told "several people that [E.B.] had slept with a Resident" and that "left the impression, as one witness recounted, that [E.B.] was a 'loose woman.'" "Another witness confirmed that [Chaudhuri] was telling 'people that [E.B.] had a sexual relationship with one of the interns . . . . Chaudhuri "was making [E.B.] out to be mentally unstable" and he presented [E.B.] as "a crackpot." '[ ] Another witness stated that after [E.B.] resigned, Dr. Chaudhuri 'was critical of [E.B.'s] work and told [the witness] that [E.B.] "had not completed some assignment." ' "

Chaudhuri knew that E.B. had been sexually assaulted in December 2012 by someone unrelated to the university. After E.B. complained to the university and charges were filed, Chaudhuri "brought up [E.B.'s] assault" to three different witnesses. "One of those witnesses said she heard from at least four other people that Dr. Chaudhuri had talked to them about [E.B.]—either repeating that she had been assaulted or that she was having an affair with a Resident, or both." And Chaudhuri "admitted to the investigator that he 'may have' brought up" the sexual assault with "several witnesses."

The Committee heard the matter over three days in June 2016.  Both complainants refused to testify.  In its ruling on Chaudhuri's petition to set aside the Committee's findings and recommendations, the trial court included the following information:

The university "did not call [E.B.] as a witness.  Instead, [the university] introduced testimony from [K.M.], a former roommate of [E.B.]  [Chaudhuri] testified in the proceedings and was cross-examined by [the university].  [Chaudhuri] also called five character witnesses as well as a clinical and forensic psychologist to testify.  The Committee also considered documentary evidence.[3]

"On August 5, [2016], after [Chaudhuri] and [the university] had presented their evidence to the Committee, the Committee informed the parties it intended to call witnesses who had not been called by either party during the evidentiary hearing.  The Committee stated it intended to seek testimony from [E.B.] and the investigator in addition to others.  Knowing [Chaudhuri] objected to the Committee calling any witnesses, the Committee invited [Chaudhuri] to submit 'a full statement of [his] objection . . . .'  [Citation.]  [Chaudhuri] thereafter filed his objection arguing, among other things, allowing the Committee to

---

[3] "Although the Committee considered the Report of Investigation, its author . . . did not testify.  Just prior to the hearing, [the university] sought to supplement its witness list to include [the author].  [Chaudhuri] objected.  The Committee did not allow [the university] to supplement its witness list but noted it had the right to call additional witnesses."

call witnesses was 'inherently unfair' and would 'violate[ ] [Chaudhuri's] rights to due process.'

"The Committee ultimately elected not to call any further witnesses in the matter."

On January 31, 2017, the Committee wrote a letter to the university's Chancellor setting forth its findings and disciplinary recommendations. The Committee concluded that Chaudhuri had violated the Faculty Code of Conduct and the university's policy prohibiting sexual harassment and had repeatedly attempted to interfere with the investigation. The Committee recommended that the university:

- "Take away Dr. Chaudhuri's ability to supervise others including, but not limited to, faculty (including input on academic personnel cases), students, staff, postdocs, researchers, and residents.[4]
- "Impose a permanent 'Curtailment of Emeritus Status,'[ ] which would allow him to hold the title of Emeritus upon retirement, but would preclude his ability to serve in any position with supervisory responsibilities following retirement, including any recall position.
- "If Dr. Chaudhuri opts not to retire immediately, [the Committee] recommend[ed] permanent demotion[ ] from 'Further Above Scale' to Full Professor Step IX (relinquishing his right to use 'Distinguished Professor')." (Fns. omitted.)

The university's Chancellor and President accepted the recommendations and imposed the sanctions.

---

[4] Chaudhuri was to be allowed to continue "public supervision of residents in the clinic."

9

## B. The First Writ Petition

Chaudhuri petitioned the trial court for a writ of mandate ordering the university to set aside the Committee's findings and recommendations and to restore him to his "positions and condition" as though the university had not imposed sanctions based on the Committee's findings and recommendations.

Chaudhuri challenged the Committee's conclusions on two grounds; he contended that he had been deprived of a fair hearing because he "was denied the right to confront his accuser," and he argued that the evidence upon which the Committee based its findings and recommendations was insufficient to support those findings and recommendations.

The trial court rejected Chaudhuri's fair hearing argument. It agreed "in the abstract that a lack of ability to confront an accuser through some process in an administrative hearing may be problematic and might raise fairness concerns." It noted, however, that the university lacked the power to subpoena E.B., or any other witness or complainant not in its employ, or to otherwise compel them to attend the Committee hearing. According to the trial court, Chaudhuri "argued to the Committee that if the Committee called [E.B.] and others to testify . . . , the Committee would 'violate[]' [Chaudhuri's] 'rights to fair and equitable treatment.' [Citation.] Indeed, [Chaudhuri] argued if the Committee called any witnesses after [Chaudhuri] and [the university] had completed their cases before it, the Committee would 'violate[] [Chaudhuri's] right to fair procedures and due process.'" The trial court explained its "fair hearing" conclusion: "[Chaudhuri] now argues before this court he was denied his opportunity to confront his accuser and the investigator. Yet, when the Committee took action which had the potential to

10

provide[ Chaudhuri] with the opportunity to examine both [E.B.] and the investigator, [Chadhuri] objected on fairness and due process grounds.  [Chaudhuri's] inconsistent position with the Committee undermines his fairness claim here."

The trial court nevertheless concluded that an abuse of discretion existed under section 1094.5, subdivision (b) because the evidence before the Committee was insufficient to support its findings.  The trial court's conclusion was driven not by the substance of the evidence, but by what the trial court termed its "character."  The trial court noted that "[n]o percipient witness testified she was sexually harassed by [Chaudhuri]."  E.B.'s former roommate testified about statements E.B. had made regarding Chaudhuri and a variety of incidents that drove the Committee's findings.  Evidence about a second complainant, K.B., who was Chaudhuri's Executive Assistant in 2008, was introduced through documents only.  Both E.B. and K.B. were invited to attend and testify, but both declined.  Although the trial court acknowledged that the Committee was not bound by the Evidence Code, it found significant that "[w]ith the exception of [Chaudhuri], all of the evidence before the [Committee] concerning the relationship between [Chaudhuri] and [E.B.] and/or [K.B.] is all hearsay.  Other than [Chaudhuri], there was no percipient witness testimony."

Based on the nature of the evidence before the Committee, the trial court ruled that the evidence was insufficient to support the Committee's findings against Chaudhuri and granted his writ petition.  The trial court entered judgment for Chaudhuri and issued a writ commanding the university to "set aside the findings and recommendations by the Committee . . . and [the

11

university's] acceptance and imposition of all sanctions based upon."

Neither the trial court's ruling, judgment, nor writ expressly provided that it was remanding the matter to the university for further proceedings other than compliance with the terms of the writ.

## C. The Second Writ Petition

In July 2019, following the trial court's May 2019 judgment, the university's Vice Chancellor for Academic Personnel notified Chaudhuri that the university was complying with the trial court's writ. The letter from the Vice Chancellor to Chaudhuri also stated: "I will notify the Committee that the Administration seeks to schedule a new hearing date as soon as possible. At the renewed hearing, the Administration will present evidence that meets the concerns expressed by the court."

The Committee set the renewed evidentiary hearing for February 2020. In January 2020, Chaudhuri petitioned the trial court for a writ prohibiting the Committee from commencing a second evidentiary hearing and ordering the Committee to dismiss proceedings against Chaudhuri. The trial court stayed the administrative proceedings pending resolution of the writ petition.

Chaudhuri posited the same arguments in the trial court he advances here. He argued that res judicata and collateral estoppel barred the university from holding a second evidentiary hearing, that a second evidentiary hearing would violate his rights to due process, and that absent an explicit remand from the trial court after his first writ petition, the university has no discretion to conduct a second or renewed hearing on the same allegations at issue in the first. The trial court rejected each of

12

these arguments in turn, denied Chaudhuri's petition for writ of prohibition, entered judgment on the writ petition in favor of the university, and extended the stay of administrative proceeding pending expiration of time to file a notice of appeal.

Chaudhuri filed a timely notice of appeal.

After the trial court's stay expired by the judgments' terms, the university again set the matter for a renewed hearing. Chaudhuri petitioned this court for a writ of supersedeas. We granted the petition and stayed the administrative proceedings pending resolution of this appeal.

## DISCUSSION

Chaudhuri contends that the trial court erroneously denied his petition to prohibit the university from holding a second evidentiary hearing on the same charges that were at issue in the first. The primary focus of Chaudhuri's argument is that when the trial court granted Chaudhuri's petition for a writ of mandamus and set aside the Committee's findings and recommendations for insufficiency of the evidence, it could have but did not remand the matter to the university for further proceedings, but instead merely to carry out the terms of the writ. Chaudhuri also contends that the trial court's judgment on his petition for writ of mandate bars a second hearing by the Committee because of res judicata principles. Finally, Chaudhuri contends that allowing the Committee to hear the matter again would deprive him of due process.

### A. Post-Judgment Remand

#### 1. *Carlton* & Section 1094.5

Chaudhuri contends that the trial court erred when it denied his petition for a writ to prohibit the Committee from hearing a second time the allegations against him regarding

13

sexual harassment of his Executive Assistants from 2008 to 2013. Chaudhuri contends that if the trial court had intended to allow the Committee to hold a second evidentiary hearing following the judgment on Chaudhuri's first writ petition, it could have done so under the terms of section 1094.5, subdivision (f). Because it did not do so, Chaudhuri argues, there is no authority permitting the university to have the charges heard administratively a second time.

Chaudhuri bases his argument in part on the statutory text of section 1094.5, subdivision (f), which states: "The court shall enter judgment either commanding respondent to set aside the order or decision, or denying the writ. Where the judgment commands that the order or decision be set aside, it may order the reconsideration of the case in light of the court's opinion and judgment and may order respondent to take such further action as is specially enjoined upon it by law, but the judgment shall not limit or control in any way the discretion legally vested in the respondent."

Emphasizing the word "may" in section 1094.5, subdivision (f), Chaudhuri contends that the trial court had discretion to expressly remand the matter after judgment on his petition for writ of mandate. The absence of language in the judgment or the writ providing for further proceedings bars those further proceedings, according to Chaudhuri.

The trial court disagreed. The trial court concluded that it was bound by *Carlton v. Department of Motor Vehicles* (1988) 203 Cal.App.3d 1428 (*Carlton*).

In *Carlton*, the DMV had "found Carlton to be a negligent operator of a motor vehicle and ordered his license suspended. The suspension was stayed and Carlton was placed on probation.

14

Under the terms of his probation, Carlton was required to 'remain free from traffic accident responsibility.' [¶] While on probation, Carlton was involved in a traffic accident. No citation was issued to Carlton but the police report on the accident sent to DMV stated that in the reporting officer's opinion Carlton was 'most responsible' for the accident. . . . DMV revoked Carlton's probation and suspended his driver's license solely on the basis of the opinion expressed in the accident report that Carlton was responsible for the accident. [¶] Carlton requested a formal hearing . . . [and] [t]he only evidence at the hearing relevant to the question whether Carlton had violated a condition of his probation was a computer printout of his driving record which contained the opinion expressed in the accident report that Carlton was responsible for the accident. . . . Solely on this evidence, the hearing officer upheld the revocation of probation and suspension of Carlton's license." (*Carlton, supra,* 203 Cal.App.3d at pp. 1431-1432.) The trial court concluded that the evidence produced at Carlton's hearing was insufficient to support the decision and issued a writ ordering the DMV to set aside its decision. (*Id.* at p. 1432.)

One of DMV's contentions on appeal was that the trial court "erred in not specifically remanding the matter to the DMV for a new hearing." (*Carlton, supra,* 203 Cal.App.3d at p. 1434.) The Court of Appeal rejected the DMV's contention. "Where an administrative decision is set aside for insufficiency of the evidence it is customary to remand the matter to the agency for a new hearing [citations] except in the rare case where as a matter of law no evidence could support the agency's decision. [Citation.]" (*Ibid.*) The court explained that it was "conceivable the DMV could produce competent evidence sufficient to establish

Carlton was responsible for the accident," and that "[n]*othing in the writ of mandate precludes it from doing so*." (*Id.* at pp. 1434-1435.) "The writ merely orders the DMV to set aside its decision revoking Carlton's probation and suspending his license and to reinstate Carlton's license as it existed immediately prior to that suspension. In other words, the DMV is to reinstate Carlton's probationary status pending further proceedings as the DMV may choose to initiate." (*Id.* at p. 1435.)

We see no meaningful distinction between the procedural posture of *Carlton* and this matter. Where the trial court's judgment was silent, the trial court did not err by failing to expressly remand the matter to the agency because the agency was already free to conduct further proceedings about the same question after complying with the terms of the trial court's writ. The writ did no more than place the petitioner back in the position he was in *before* the agency's hearing began based on the sufficiency of the type of evidence the agency produced to support the agency's conclusion. And the language of section 1094.5, subdivision (f) is the same today as it was when *Carlton* was decided. (See *Voices of the Wetlands v. State Water Resources Control Bd.* (2011) 52 Cal.4th 499, 526 (*Wetlands*).)

Chaudhuri contends that this case is different from *Carlton* because *Carlton* involved a driver's license and this case involves "disciplinary or punitive sanctions" implicating "due process concerns." We address that contention below with Chaudhuri's general due process argument.

Chaudhuri also argues that this case differs from *Carlton* because in *Carlton*, the DMV specifically requested a remand and the trial court refused to remand the matter. To achieve a remand, then, Chaudhuri's argument follows, the DMV had to

16

raise the matter on appeal.  By *not* requesting a remand in the trial court, Chaudhuri contends, the university has forfeited its ability to do anything on remand other than follow the terms of the trial court's writ of mandate that favor him.  We reject that contention.

*Carlton*'s conclusion that the trial court did not err when it declined to specifically remand the matter *because* the DMV retained the right to rehear the matter after the writ issued would mean nothing if we interpreted *Carlton* as Chaudhuri urges.  *Carlton* affirmed a trial court judgment notwithstanding the fact that it disagreed with the trial court's presumptive denial of a remand (or reconsideration) request under section 1094.5, subdivision (f) because the agency retained the right to rehear the matter after issuance of the writ regardless of the trial court's refusal to expressly remand.

Although *Wetlands* is procedurally distinguishable, and therefore not directly on point, the Supreme Court did confirm, in dicta, that the approach *Carlton* adopted was correct.  In *Wetlands*, the trial court concluded that the agency's decision was "*not sufficiently supported* by the original administrative record. The only possible cure for such a deficiency," the Supreme Court said, "is the agency's reconsideration of its decision *on the basis of additional evidence*."  (*Wetlands*, *supra*, 52 Cal.4th at p. 531, original italics.)  The Supreme Court instructed that the trial court had the option under section 1094.5, subdivision (f) to order the agency to reconsider its determination "*in light of*" the trial court's judicial determination—"i.e., a reconsideration in which the agency may entertain all the additional evidence [the trial court concluded was missing] to support its new decision." (*Wetlands*, at p. 531.)

The Supreme Court said that, as an alternative to focusing the trial court as allowed by section 1094.5, subdivision (f), the trial court could have simply "vacated" the agency's decision. In *that* case, new agency proceedings on the same questions could have been initiated free from the trial court's instructions about what evidence should be considered. (*Wetlands*, *supra*, 52 Cal.4th at p. 531.)

The Supreme Court appears to have read section 1094.5, subdivision (f) not as foreclosing agency reconsideration if not expressly mentioned in a trial court's judgment, but rather on *how* agency reconsideration would proceed *if* the trial court expressly referred to agency reconsideration. Section 1094.5, subdivision (f) states that "[w]here the [trial court's] judgment commands that the [administrative] order or decision be set aside, [the trial court] may order the reconsideration of the case *in light of the court's opinion and judgment . . . .*" (Italics added.) The Supreme Court focused on the words "in light of the court's opinion and judgment" in section 1094.5. We also find that language significant. Additionally, we view section 1094.5, subdivision (f)'s last clause as equally significant: "the judgment shall not limit or control in any way the discretion legally vested in the respondent."

The statutory language, *Carlton*, and *Wetlands* all lead us to conclude that subdivision (f) allows the trial court to focus administrative reconsideration by, in its judgment, "order[ing] the reconsideration of the case *in light of the court's opinion and judgment.*" (§ 1094.5, subd. (f), italics added.) Or the trial court may remain silent regarding reconsideration, which allows an agency to act with "the discretion legally vested" in the agency after complying with the writ.

18

## 2. Due Process

Without specifying how, Chaudhuri also contends that allowing the Committee to conduct further proceedings would deprive him of due process. Chaudhuri contends that cases allowing remand or ordering agency reconsideration under section 1094.5, subdivision (f) are inapposite because the nature of the substantive questions at issue are different. It is different, Chaudhuri contends, to remand a case for agency reconsideration where the case involves a permit or license, as in *Carlton* and *Wetlands*, than it is to allow the agency to reconsider a case involving public employment or a reduction in pay grade.

We have found no case, and Chaudhuri directs us to none, deciding whether a second hearing after a trial court vacates an administrative order would violate due process principles. We turn to that question.

"Under the California Constitution, a person may not be deprived of life, liberty, or property without due process of law. (Cal. Const., art. I, § 7, subd. (a).) 'The concept of "due process of law" guarantees both procedural and substantive rights.'" (*Bottini v. City of San Diego* (2018) 27 Cal.App.5th 281, 287 (*Bottini*).)

Chaudhuri's briefing does not state whether he is advancing a procedural or substantive due process argument against the Regents, or both.[5]

---

[5] Chaudhuri cites no case in his due process arguments here that contains a substantive due process analysis. Nor does he provide either argument or authority supporting a substantive due process analysis. Chaudhuri's briefs fail even to make an argument regarding the appropriate standard of review if what

19

The cases Chaudhuri cites *all* deal with fundamental property interests protected by procedural due process.  (See *Brown v. City of Los Angeles* (2002) 102 Cal.App.4th 155, 169; *Ng v. State Personnel Bd.* (1977) 68 Cal.App.3d 600, 605; *Board of Regents of State Colleges v. Roth* (1972) 408 U.S. 564, 569-570; *Millview County Water Dist. v. State Water Resources Control Bd.* (2014) 229 Cal.App.4th 879, 908-909.)  But Chaudhuri does not contend that the university denied him notice and an opportunity to be heard at any point or that a second hearing would deny him "notice and an opportunity to be heard before depriving [him] of a protected liberty or property interest—the foundational requirements of procedural due process." (*Bottini*, *supra*, 27 Cal.App.5th at p. 287.)  We therefore construe Chaudhuri's arguments as sounding in *substantive* due process.[6]  (See *ibid.*)

"Substantive due process protects against arbitrary government action.  [Citation.]  A substantive due process violation requires more than 'ordinary government error,' and the 'arbitrary and capricious' standard applicable in other contexts is a lower threshold than that required to establish a substantive due process violation.  [Citation.]  A substantive due process violation requires some form of outrageous or egregious conduct

he alleges is a violation of substantive due process.  Because we have been unable to discern a cognizable procedural due process argument, we are left to analyze Chaudhuri's vague due process contentions as a substantive due process challenge.

[6] Chaudhuri's counsel first invoked substantive due process in this matter in response to a question from the bench during oral argument on this appeal.

constituting 'a true abuse of power.' " (*Las Lomas Land Co., LLC v. City of Los Angeles* (2009) 177 Cal.App.4th 837, 855-856.)

"To determine whether a person's . . . interest for purposes of substantive due process has been violated, the court must balance his or her . . . interest against the relevant state interests. [Citation.] Where the state infringes on a fundamental constitutional right, strict scrutiny applies; otherwise, the rational basis test applies. [Citation.] A law [or government action] subject to strict scrutiny is upheld only if it is narrowly tailored to promote a compelling governmental interest. [Citation.] Under rational-basis review, by contrast, a law [or government action] need only bear a rational relationship to a legitimate governmental interest." (*Love v. State Dept. of Education* (2018) 29 Cal.App.5th 980, 989, fn. omitted.)

Because our review of an asserted substantive due process challenge in this context turns on the nature of the right or interest asserted, Chaudhuri's citation to cases that deem public employment a "fundamental" right is significant. If the challenge is a substantive due process challenge, it is also inapposite.

A "fundamental right for purposes of the judicial standard of review of administrative decisions" is different than "a fundamental right for purposes of constitutional analysis." (*Graham v. Kirkwood Meadows Public Util. Dist.* (1994) 21 Cal.App.4th 1631, 1642-1643 (*Graham*).) "The distinction was explained in *Berlinghieri v. Department of Motor Vehicles* (1983) 33 Cal.3d 392 . . ., which held the right to retain a driver's license was a 'fundamental' right for purposes of independent judicial review of an administrative decision to suspend the license. In explaining that its decision did not alter its prior holding that such right was not a fundamental right invoking strict scrutiny

review for constitutional analysis purposes, the Supreme Court stressed an important distinction: ' . . . the standard of review question . . . relates to the appropriate relationship between *administrative* and *judicial* adjudicatory decisions, and does not concern the constitutional legitimacy or validity of legislative policy judgments at all. Thus, . . . the fundamental right category does not identify areas in which substantive legislative judgments are in any manner constitutionally suspect or justify unusual judicial scrutiny; rather, that category simply encompasses those quasi-judicial administrative decisions that have an impact on the individual sufficiently vital . . . to compel a full and independent review by the court. [Citation.] [¶] Indeed, . . . the applicability of the independent judgment standard of review does not in any sense suggest that legislative measures pertaining to the individual interest at issue are properly subject to strict scrutiny review. [Citation.]' [Citation.]

"The Supreme Court cautioned against any 'blurring of two separate and distinct senses in which the term "fundamental" is used. [¶] There is little similarity between the analysis applied in determining (1) whether a right is a 'fundamental right' for equal protection/due process purposes on the one hand, and (2) which scrutiny is applicable for administrative review purposes, on the other. The principle of "fundamentality" differs depending on the context or analysis within which the concept arises. Thus, for example, when determining which rights are "fundamental" for due process purposes, a court's attention focuses primarily on whether the right (1) is specifically guaranteed by the Constitution, (2) affects the integrity of the political process, or (3) has a disproportionate impact upon a discrete and insular minority.'" (*Graham*, *supra*, 21 Cal.App.4th at p. 1643.)

For purposes of substantive due process, "there is no fundamental constitutional right to work for, or to have continued employment with, a particular public or private employer." (*Ibid.*)

The question, then, for our purposes, is whether allowing the university to hold a second hearing regarding the merits of the charges against Chaudhuri "bears 'some rational relationship to a conceivable legitimate state purpose.' " (*Graham*, *supra*, 21 Cal.App.4th at p. 1646.) "The burden is on the party challenging the constitutionality of the policy [or state action] to show that it bears no rational relationship to a legitimate governmental purpose." (*Ibid.*)

Chaudhuri's briefing did not distinguish between substantive and procedural due process, and made no effort to demonstrate that a rehearing could bear no rational relationship to a legitimate governmental purpose. Our inquiry could end there. Nevertheless, we examine the question on its merits in the context of this matter.

Here, a rehearing on the merits could conceivably relate to multiple legitimate public interests. As the Regents explained in their briefing here, the university has an "obligation to address sexual misconduct in its community and the debilitating effect that such misconduct has on its victims and on the university's mission . . . ." Beyond that, public employers, as private employers, are entitled to some flexibility in the way that they manage personnel matters. The university's inability to subpoena witnesses, for example, coupled with Chaudhuri's campaign to retaliate against and discredit the complaining witness, left the university after the initial hearing with only hearsay that the trial court found insufficient.

We also find it significant in the context of this matter that Chaudhuri interfered with the investigation and hearing as the record indicates. Administrative proceedings free from interference and complainants' ability to report alleged sexual harassment free from retaliation are legitimate interests that are conceivably related to a rehearing in this matter with testimony from percipient witnesses.

We do not find persuasive Chaudhuri's argument that he may be subject to countless seriatim administrative proceedings. Chaudhuri relied on *Ashford v. Culver City Unified School Dist.* (2005) 130 Cal.App.4th 344 (*Ashford*), *Newman v. State Personnel Bd.* (1992) 10 Cal.App.4th 41 (*Newman*), and dicta in *Wetlands* to argue that a second hearing is equivalent to never-ending hearings on the same question until the university gets the result it wants. Indeed, those cases support the opposite conclusion.

In *Ashford* and *Newman*, each court concluded that no agency reconsideration on the merits was warranted. *But neither did so on due process grounds*. *Ashford* did so because the agency "had made no claim . . . that it in fact has any new evidence that it could present at such a hearing." (*Ashford, supra*, 130 Cal.App.4th at p. 354.) And *Newman* did so because it concluded that the agency's first decision had been based on the only evidence the agency would have been allowed to consider—no evidence existed that the agency could consider on remand. (*Newman, supra*, 10 Cal.App.4th at p. 50.)

In contrast to both *Newman* and *Ashford*, the trial court's ruling on Chaudhuri's petition for writ of mandate—a ruling that took issue with the *form* of the evidence produced at the first hearing, and not its *substance*—clarifies what *form* the evidence needs to take in a second hearing. The university has stated that

24

it will produce the evidence in a form necessary to address the trial court's concerns. Indeed, the university filed a declaration in the trial court that stated: "The witnesses that have now agreed to testify at a new hearing represent the universe of percipient witnesses knowledgeable of the facts giving rise to the disciplinary charges. Their testimony will constitute the best evidence the University can muster." That representation appears to address Chaudhuri's concern about multiple rehearings and brings a single rehearing with live percipient witness testimony into strict conformance with *Ashford* and *Newman*.

Chaudhuri has demonstrated—and we have found—no substantive due process violation presented by a second administrative hearing in this matter.

## B. Res Judicata

Chaudhuri argues that the trial court erred when it concluded that res judicata does not bar renewed Committee proceedings. When it entered judgment on Chaudhuri's petition for writ of mandate, he posits, the trial court "concluded the matter between the parties, and the only action left was for [the university] to comply with the terms of the writ." The argument's thread is that the trial court's judgment based on sufficiency of the evidence to support the administrative findings forecloses any administrative opportunity to produce evidence sufficient to support any administrative findings regarding the allegations against Chaudhuri.

We disagree with Chaudhuri's contentions.

" 'The prerequisite elements for applying [res judicata] to either an entire cause of action or one or more issues are the same: (1) A claim or issue raised in the present action is identical

25

to a claim or issue litigated in a prior proceeding; (2) the prior proceeding resulted in a final judgment on the merits; and (3) the party against whom the doctrine is being asserted was a party or in privity with a party to the prior proceeding.'" (*People v. Barragan* (2004) 32 Cal.4th 236, 253.)  The arguments here center on the first of the three elements.

Chaudhuri's argument conflates the issues involved in the administrative proceeding with the issues the trial court considered on his petition for writ of mandate.  Indeed, in his briefing, Chaudhuri clouds the question by arguing that the *trial court's judgment* operates as a bar to further proceedings by the Committee by explaining that "the claim to be decided in the *second disciplinary hearing—whether Dr. Chaudhuri sexually harassed* [*E.B.*]—*is identical to the claim which was adjudicated in the first hearing*."

But it is not the results of the *first hearing* that Chaudhuri attempts to use to bar a *second hearing*.  It is the judgment on his *writ petition*.

The trial court's judgment on Chaudhuri's petition for writ of mandate adjudicated only whether the evidence in the administrative record was sufficient to support the administrative findings, and *not* whether Chaudhuri had sexually harassed either of the complainants.  The issues in the two proceedings were not identical.  The trial court explained as much at the hearing in this matter:  "My decision [on the first writ petition] was reviewing whether or not there was sufficient evidence below.  And it's not the same decision that the agency made."

The agency did not then and does not now challenge the trial court's conclusion or issuance of a peremptory writ of

26

mandate. Whether the evidence was sufficient to support the administrative decision after the June 2016 hearing is no longer at issue in any proceeding. But neither does that operate as a bar to the Committee rehearing the matter based on whatever evidence may be produced at the renewed hearing.

## DISPOSITION

The stay we imposed pending the outcome of this appeal is dissolved. The trial court's judgment is affirmed. Respondent is entitled to its costs on appeal.

NOT TO BE PUBLISHED

CHANEY, J.

We concur:

BENDIX, Acting P. J.

CRANDALL, J.*

---

* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

27